ALBERT C. RATHBUN AND OTHERS v.
W. T. GRANT COMPANY.
WALTER O. JOHNSON AND ANOTHER v. SAME.

219 N. W. 2d 641.

June 14, 1974—Nos. 44328, 44332.

224

*Faegre & Benson, John S. Holten,* and *Gordon G. Busdicker,* for appellant.

*Mark Reinhardt* and *Paul W. Onkka, Jr.,* Legal Assistance of Ramsey County, Inc., for respondents Rathbun.

*Sigal & Savelkoul* and *Donald C. Savelkoul,* for respondents Johnson.

TODD, JUSTICE.

In each of these cases, defendant appeals from a partial summary judgment declaring its retail installment credit coupon book plan to be usurious under the laws of the State of Minnesota. Defendant also challenges in these appeals the orders of the court entered in these matters allowing a class action. We conclude that the trial court properly found the coupon plan to be usurious, but vacate the court's orders on the class action in part and remand to the trial court for further proceedings.

Defendant is a national merchandiser of a large range of consumer products, ranging from the smallest household items to large major appliances. In 1972, it had sales in excess of $1,600,000,000. In Minnesota, defendant operates five retail stores, in St. Paul, Crystal, Cottage Grove, St. Cloud, and Winona. Defendant offers to customers three basic types of credit plans: (1) The revolving charge agreement plan; (2) the retail installment credit special purchase plan under which single items are financed on an installment payment basis; and (3) the retail installment credit coupon book contract plan. Only the final plan is involved in this litigation. This plan has been available to defendant's customers since 1946.

Under the coupon plan, the customer purchases a book of coupons in denominations ranging from 50 cents to $10, and totaling from $10 to $200. The coupon books can be purchased for cash and apparently are so purchased for use as gift certificates, clothing allowances, or the like.

However, a large majority of the coupon books are sold on a finance plan. A customer so purchasing a coupon book must fill out standard credit applications and obtain a line of credit. He is issued coupons pursuant to a contract. Prior to January 1, 1971, the finance charges provided by the contract began to

accrue on the date of purchase of the coupons, with the first payment due 30 days after the signing of the contract.

The accrual of finance charges on new accounts opened after January 1, 1971, commences only after the first negotiation of a coupon. The first payment is due 30 days thereafter.

The third variation of the plan is the add-on account which permits a customer who has previously purchased a coupon book, but has not fully paid for it, to have additional coupons issued to him. Under this plan, finance charges commence immediately upon execution of the new add-on agreement. At the time of the execution of the finance or add-on agreement, the customer is offered credit life insurance, credit health insurance, or both. If desired, this insurance is added to the plan and financed in accordance with the prevailing rate schedule.

The standard period of payment has averaged 24 months for each coupon contract. Prior to 1971, the plan provided that if the coupons were returned within 30 days of the execution of the agreement, no finance charges or principal were due. After January 1, 1971, all coupons could be returned at any time without charge. A customer who returns unused coupons is given full credit, including credit for finance charges attributable to the unused coupons.[1]

The coupons are nonnegotiable and cannot be redeemed for cash. Cash change will be returned only on amounts of 49 cents or less. The coupons cannot be used for payment of finance contracts or installment sales, but are otherwise unlimited in the purchase of merchandise and services in defendant's stores.

The coupon book contains the following instructions regarding the use of the coupons:

---

[1] Defendant's emphasis of this factor throughout its brief seems somewhat misleading. Because of the method of calculation used, the sum of the digits, the bulk of the finance charge is attributable to the first coupons used. The net effect of defendant's method of calculation of finance charges is that as more coupons are returned, the effective rate of the finance charges on the coupons used increases.

"How to use your GRANT-A-CHARGE credit coupons

"1. Use them like cash for goods or services in any department of the W. T. Grant Company. However, they cannot be accepted as down-payment or for payment on your account.

"2. The buyer may return unused coupons at any time and GRANTS will give the buyer a full credit refund for the face amount thereof, plus a complete service charge refund on the unused coupons.

"3. If you wish to purchase with credit coupons a single item of merchandise and/or services of greater value than the coupons you now hold, you may save credit service charge by returning your unused coupons to GRANTS for credit and purchasing new coupons."

On December 11, 1970, plaintiffs Walter O. Johnson and Rosemary Johnson entered into an add-on agreement with defendant under its retail installment credit coupon book plan. Their existing balance of $201.96 was reduced by the unearned finance charges and was added to the cost of two new coupon books, property insurance, credit life insurance, credit health and sickness insurance, and finance charges, resulting in a new balance of $371.07. The annual percentage rate designated in this contract under the truth-in-lending regulation is 19.90 percent. The Johnsons commenced action against defendant alleging a proper class action and asking in their prayer for relief in their amended complaint that all interest charges be adjudged illegal, be declared null and void, and be canceled; that the plan be adjudged illegal under the Minnesota usury statute; and that attorneys' fees be awarded.

Plaintiffs Albert C. Rathbun and Elaine J. Rathbun on July 10, 1970, executed an add-on retail installment sales contract under defendant's coupon book plan and became indebted to defendant in the amount of $707.09, which included a prior balance with adjustment of finance charges, $115 in new coupons, insurance charges, and finance charges. The Rathbuns commenced action against defendant and in their amended complaint sought

judgment of the court that the matter be declared a proper class action. They further sought declaration that defendant's contracts are null and void under the Minnesota usury statute, or, alternatively, that they violate Minn. St. 334.16, or were made in violation of the small loan licensing law of Minnesota. They further requested injunctive relief, barring defendant from entering coupon contracts or similar devices and sought an injunction ordering defendant to serve a copy of the judgment on all persons who have entered into agreements and upon any finance companies or others to which said agreements were assigned. They also requested that damages be awarded in an amount equal to three times any finance charge imposed, charged, or collected, or, alternatively, that damages be awarded to plaintiffs in an amount equal to the full amount of interest paid to defendant pursuant to the usury statute, plus attorneys' fees and costs.[2]

On August 8, 1972, motions for partial summary judgment filed by the plaintiffs in both actions were orally argued to the court. Submission was deferred, pending a determination as to whether the captioned actions should be maintained as class actions and whether they should be consolidated for trial. Pursuant to the court's order of October 10, 1972, it was determined that the captioned actions should be consolidated and should be conditionally maintained as class actions. The class was defined as all resident customers of defendant from and after November 8, 1969, under its retail installment credit coupon plan. The parties were given time to file briefs directed solely to the issue of whether defendant had violated the provisions of the Minnesota usury statute. Pursuant to the court's order on November 27, 1972, it was determined that the captioned actions should be

---

[2] The following parties were allowed to intervene in the Rathbun action, adopting the pleadings therein as their own: Carol Ballard, Barbara Osborne, Terrace Osborne, Bobbie Lloyd, Anna McIntosh, and Theodore Balsimo. The action of W. T. Grant v. Marie Balsimo was consolidated with this action.

unconditionally maintained as a class action on a consolidated basis and notice be sent to all members of the class. The notice provided in part that unless the notified person elected to be excluded from the class on or before December 31, 1972, he or she would be included therein. In addition, the notice advised the class members that plaintiffs sought to recover finance charges heretofore paid under such plan and to have the contracts issued under such plan declared void.

On January 19, 1973, the district court issued its order for partial summary judgment in both actions, adjudging that all finance charges disclosed in the contracts of defendant on its retail installment credit coupon book contract are imposed for the loan of a money equivalent and the forbearance of a debt, constitute interest greater than $8 per $100 for 1 year, and are, therefore, usurious and illegal under Minn. St. c. 334.

■ Defendant claims that the matter was not a proper item for decision on a motion for summary judgment. Under Rule 56.03, Rules of Civil Procedure, to grant summary judgment the trial court must find that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law. A material fact is one of such a nature as will affect the result or outcome of the case depending upon its resolution. In Sauter v. Sauter, 244 Minn. 482, 485, 70 N. W. 2d 351, 353 (1955), we said:

"The controlling words *genuine issue* and *material fact* need no amplification since they best speak for themselves. Their application in determining whether there is an absence of a *genuine issue* as to a *material fact* requires a careful scrutiny of the pleadings, depositions, admissions, and affidavits, if any, on file. Since, however, all factual inferences must be drawn against the movant for summary judgment, it follows that, even where the movant's supporting documents are uncontradicted, they may in themselves be insufficient to sustain his burden of proof."

See, also, Dempsey v. Jaroscak, 290 Minn. 405, 188 N. W. 2d 779

(1971). However, if any doubt exists as to the existence of a genuine issue as to a material fact, the doubt must be resolved in favor of finding that the fact issue exists. Facts, inferences, or conclusions that may be drawn by a jury are fact issues. Couillard v. Charles T. Miller Hospital, Inc. 253 Minn. 418, 92 N. W. 2d 96 (1958).

The trial court in granting summary judgment on the usury issue properly applied Minnesota law which follows the general rule as to what constitutes usury—the taking or receiving of more interest or profit on a loan than the law allows. To conclude that a transaction is void for usury within this definition, the court must find the following: (a) A loan of money or forbearance of a debt; (b) an agreement between the parties that the principal shall be repayable absolutely; (c) the exaction of a greater amount of interest or profit than is allowed by law; and (d) the presence of an intention to evade the law at the inception of the transaction. Schauman v. Solmica Midwest Inc. 283 Minn. 437, 168 N. W. 2d 667 (1969). See, also, Note, 21 Minn. L. Rev. 585. The subject matter must be money or its equivalent. Van Asperen v. Darling Olds, Inc. 254 Minn. 62, 93 N. W. 2d 690 (1958); In re Bibbey, 9 F. 2d 944 (D. Minn. 1925). The absence of any one of these requisites precludes finding of usury. Van Asperen v. Darling Olds, Inc. *supra*. The trial court concluded that there were no material facts which presented a genuine issue in respect to application of this standard.

■ The statutory definition of the allowable rate of interest is contained in Minn. St. 334.01, which provides in part:

"The interest for any legal indebtedness shall be at the rate of $6 upon $100 for a year, unless a different rate is contracted for in writing; and no person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater sum, or any greater value, for the loan or forbearance of money, goods, or things in action, than $8 on $100 for one year; * * *."

There are several statutory exceptions to this interest ceiling;[3] however, none of them is applicable, other than by inference, to defendant's plan.

In addition to the statutory exceptions, Minnesota cases starting with Dunn v. Midland Loan Finance Corp. 206 Minn. 550, 289 N. W. 411 (1939), have developed a body of law holding that a bona fide installment sale does not come within the purview of the usury statute. This is commonly known as the "time-price" doctrine. The principle of the exception as stated in Dunn is as follows (206 Minn. 553, 289 N. W. 413):

"There can be no usury unless the transaction involves a loan or forbearance of money. Bangs v. Midland Loan & Finance Co. 200 Minn. 310, 274 N. W. 184. A sale of personal property is not a loan or forbearance of money and is not within the usury law unless the sale is a mere form or device to evade the usury law. Trauernicht v. Kingston, 156 Minn. 442, 195 N. W. 278. The increase of the credit price for the purposes of the conditional sales contract does not convert what otherwise would be a sale into a loan. The owner has the right to determine the price at which he will sell his property. He may fix one price for cash and another price for credit. The fact that the credit price exceeds the cash price by a greater percentage than is permitted by the usury law does not make the transaction usurious for the very plain reason that the transaction is a sale and not a loan."

However, as recognized in Dunn, the nature of a particular transaction is a question of fact, not to be determined by what the parties represent the transaction to be, but by considering

---

[3] Minn. St. 48.153, applying to installment loans by banks and giving an effective rate of 12 percent in certain situations; Minn. St. 168.72, allowing a time-price differential of between $8 and $13 per $100 in motor vehicle retail installment sales; Minn. St. 52.14, providing for interest charges by credit unions; Minn. St. 53.04, providing for interest charges by industrial loan and thrift companies; Minn. St. 56.13, providing for interest charges by small loan companies; Minn. St. 334.16 to 334.18, governing revolving charge accounts.

all of the evidence to ascertain if the true character of the transaction is in substance a contract to receive a usurious rate of interest for a loan or forbearance of money. As the court further stated in Dunn (206 Minn. 555, 289 N. W. 414):

"This type of transaction is not to be confused with that where the parties definitely agree upon a binding sale price, payable in whole or in part by deferred payments for the reason that such a contract creates a debt for the unpaid purchase price, or part thereof, and the granting of time to pay is a forbearance to collect such existing debt, which it is conceded everywhere is subject to the usury law."

Defendant argues vigorously that its coupon plan qualifies as an exception to the statute under the time-price doctrine. The time-price doctrine enunciated in our decision in Dunn has a long history of development. Beete v. Bidgood, 108 Eng. Rep. 792 (K. B. 1827); Hogg v. Ruffner, 66 U. S. 115, 17 L. ed. 38 (1861). These cases enunciated the principle that a seller who increased the price of his merchandise to an amount in excess of the maximum legal interest rate when he sold on credit would not violate the usury law. This doctrine in its inception recognized the social conditions of the nineteenth century and the era of laissez-faire mercantilism that existed at that time. These cases usually involved items of high price which the buyer ordinarily could not afford to purchase with cash and a buyer and seller substantially on equal footing in bargaining over price and credit charges. The doctrine was expanded to cover items less unique and costly, but it was not until the practice of installment buying became a common consumer practice that it gained wide acceptance. This application of the exception to the usury law did a disservice to the original concept of that law, which was to protect weak and needy persons from the overreaching of economically superior renters of capital. It is apparent that the bargaining position of installment buyers may be as disadvantageous today as that of borrowers. Thus, any expansion of this

doctrine must be justified in light of the economic needs and social attitudes as they now exist.[4]

Defendant contends that to hold the coupon plan is not within the time-price doctrine would require us to overrule our prior decisions. It is our position that we would have to expand the limits of the doctrine as defined in Dunn v. Midland Loan Finance Corp. 206 Minn. 550, 289 N. W. 411, and Van Asperen v. Darling Olds, Inc. 254 Minn. 62, 93 N. W. 2d 690, to include defendant's plan in the doctrine. We decline to do so.

■ Having found no applicable exception to the usury rules, we must examine the record to determine if there is any genuine issue of material fact in dispute which would preclude the entry of summary judgment. The first consideration is whether the coupon plan involves a loan of money or its equivalent or the forbearance of a debt.

Black, Law Dictionary (Rev. 4 ed.) p. 773, defines forbearance as "[a]ct by which creditor waits for payment of debt due him by debtor after it becomes due. * * * A delay in enforcing rights. * * * Indulgence granted to a debtor. * * * Refraining from action. The term is used in this sense in general jurisprudence, in contradistinction to 'act.' " In usury law, the term signifies "contractual obligation of a lender or creditor to refrain, during a given period of time, from requiring the borrower or debtor to pay a loan or debt then due and payable." Hafer v. Spaeth, 22 Wash. 2d 378, 384, 156 P. 2d 408, 411 (1945).

The Wisconsin, South Dakota, and Iowa courts have recently invoked the forbearance theory to invalidate revolving charge account plans. State v. J. C. Penney Co. 48 Wis. 2d 125, 179 N. W. 2d 641 (1970); Rollinger v. J. C. Penney Co. 86 S. D. 154, 192 N. W. 2d 699 (1971); State ex rel. Turner v. Younker Brothers, Inc. 210 N. W. 2d 550 (Iowa, 1973). The rationale of these decisions is that forbearance need not appear at the time

---

[4] Warren, *Regulations of Finance Charges in Retail Instalment Sales,* 68 Yale L. J. 839, 842; Berger, *Usury in Installment Sales,* 2 Law & Contemp. Prob. 148; Note, 1971 Wis. L. Rev. 296.

of the creation of the contract nor need it exist simultaneously with the purchase of goods. It remains dormant during a period when the debtor may pay the obligation without finance charges and automatically comes into play when the finance charges are incurred. This view was recently rejected by the District of Columbia Court of Appeals in Kass v. Garfinckel, Brooks Bros., Miller & Rhoades, Inc. 299 A. 2d 542, 544 (D. C. App. 1973), where the court said:

"* * * We believe the Wisconsin court's basic premise, *viz.,* that a credit sale creates a debt, collection of which is forborne in exchange for interest, is irreconcilable with the time-price doctrine as it exists in this jurisdiction, being broad enough to apply to conditional sales as well as revolving credit transactions."

Defendant contends that Minnesota has limited the doctrine of forbearance to the extension of time of payment for a preexisting obligation, citing Bangs v. Midland Loan & Finance Co. 200 Minn. 310, 274 N. W. 184 (1937). However, an examination of that case reveals that it was decided on a loan theory and not on a forbearance theory. It would appear that we have not directly decided in Minnesota the question of whether forbearance necessarily involves a preexisting debtor obligation. We decline at this time to determine this issue since there is more than adequate evidence in the record to establish that the transaction involved was a loan of money or money equivalent within the applicable standards.

The trial court in its memorandum states:

"An analysis of the coupons in the light most favorable to the defendant reveals at best that they represent an advance of a medium of exchange which closely resembles money, albeit the medium of exchange can only be used in defendant's stores. They very closely approximate an advance of money, and it is difficult, if not impossible, to view the transfer of these coupons to the individual customers as a sale of intangible property, as defendant urges. As a matter of fact, the argument urging that they

are either a sale of intangibles or an option to purchase future goods puts a frightful strain on the credulity of the average person. The fact is that the coupons represent in effect a loan of money to the customer, even though that money or money equivalent can only be used in the defendant's stores."

Defendant's coupons do not come within the strict legal definition of money since their use is restricted to defendant's stores.[5] However, we have not specifically limited the word "money" in the usury statute to its legal meaning. Van Asperen v. Darling Olds, Inc. *supra.* The spirit of our usury statute is certainly such as to encompass within its reach usurious transactions, whether the subject of the loan be money, money equivalent, or extension of credit.[6] We will look through the form to the substance of a transaction. Dunn v. Midland Loan Finance Corp. 206 Minn. 550, 289 N. W. 411.

After carefully balancing the permissible uses and restrictions on defendant's coupons, we conclude that they were intended to be a money equivalent within defendant's stores. Thus, their transfer to the customer was a loan of money within the contemplation of Minn. St. 334.01.

In construing the defendant's coupon plan to constitute a loan of money equivalent, there are obviously genuine issues raised. However, as there are no material facts in dispute, such construction could properly be accomplished by summary judgment.

The second requisite to a finding of usury is the determina-

---

[5] Black, Law Dictionary (Rev. 4 ed.) p. 1157, defines money as "in usual and ordinary acceptation it means gold, silver, or paper money used as circulating medium of exchange, and does not embrace notes, bonds, evidences of debt, or other personal or real estate. * * * In its strict technical sense, 'money' means coin metal, usually gold or silver, upon which the government stamp has been impressed to indicate its value. In its more popular sense, 'money' means any currency, tokens, bank-notes, or other circulating medium in general use as the representative of value."

[6] See, 91 C. J. S., Usury, § 21, and 45 Am. Jur. 2d, Interest and Usury, § 131.

tion that the coupon plan provides for absolute payment. On the face of the agreement signed by the customer, there is no doubt that absolute payment is required. However, defendant argues that since the customer has a right to return unused coupons for full credit, the absolute requirement of repayment is in some manner vitiated. This begs the question. Until the customer takes some positive action to return the coupons, the absolute obligation to repay continues. The customer has a right to totally avoid the obligation of repayment or to reduce the obligation by the return of unused coupons. However, this does not alter the fact that the agreement signed at the time of the purchase of the coupon books requires repayment. We agree with the finding of the trial court that the documents in question require absolute repayment of the principal. Again, there is no material fact in issue which would preclude the entry of a summary judgment on this question.

It is uncontroverted by the parties that the rates of finance charges and their face amounts exceeded the profit permitted under § 334.01. Again, no material fact is in dispute to preclude the entry of summary judgment on this question.

The final requisite to a finding of usury is the presence of an intention to evade the law at the inception of the transaction. Defendant's contracts provide for a rate of interest in excess of the legal limits. Citing Patterson v. Wyman, 142 Minn. 70, 170 N. W. 928 (1919), and Midland Loan Finance Co. v. Lorentz, 209 Minn. 278, 296 N. W. 911 (1941), the trial court stated that where the parties intentionally allow for a greater interest than the law allows, the law conclusively presumes that they intended the necessary consequence of their act. Defendant contends that it acted in good faith and cites our decision in Wetsel v. Guaranteed Mortgage Co. 195 Minn. 509, 263 N. W. 605 (1935). A careful examination of the circumstances in that case indicates precautionary action by the lender which is entirely absent herein.

This is not the initial challenge to the validity of this plan, nor

the first indication of the dim view courts have taken of its propriety.[7] See, W. T. Grant Co. v. Walsh, 100 N. J. Super. 60, 241 A. 2d 46 (1968); Ives v. W. T. Grant Co. (U. S. Dist. Ct. Conn., No. 15,125, March 13, 1974); State v. W. T. Grant Co. (Cir. Ct. Dane County, Wis., No. 134-114, Aug. 14, 1972). But see, W. T. Grant Co. v. Holcomb (Los Angeles County Superior Court, Civil A 11247, Jan. 27, 1966, reversing Case No. 13583, Glendale Judicial Dist. Mun. Ct., July 30, 1965). Thus, we have no difficulty in holding that the intent necessary for a determination of usury clearly exists.

Defendant vigorously contends that there are fact questions which would dispute such a finding. A careful examination of the documents in support of this contention shows no material facts in dispute.

■ Following entry of judgment by the trial court, defendant moved the court to amend the factual determination embodied in its order of January 19, 1973, pursuant to Rule 52.02, Rules of Civil Procedure. Specifically, defendant attacked seven factual conclusions embodied in the court's memorandum, supporting each challenge with the affidavits of two of its executives. The court by its order of February 15, 1973, denied this motion, and in an accompanying memorandum stated:

"* * * [Defendant] has raised a number of inconsequential factual questions, all of which are completely and utterly *dehors* the record as the same existed at the time of submission of the motion for partial summary judgment. The affidavits raise no serious issues as to material facts and only tend to controvert facts which were not in dispute at the time of submission or are of no consequence to the issue of usury which was before the Court on the motion for partial summary judgment."

---

[7] See, also, In the Matter of W. T. Grant Co., Federal Trade Commission Docket No. 8931, which resulted in the issuance of a provisional consent order on November 27, 1973, prohibiting Grant from using deceptive tactics to sell its coupon credit plan and requiring it to disclose the nature of the plan to consumers.

In considering the motion for amendment of its findings, the trial court must apply the evidence as submitted during the trial of the case. It may neither go outside the record, nor consider new evidence. 2 Hetland & Adamson, Minnesota Practice, Civil Rules Ann., p. 500.

Plaintiffs challenge defendant's use of affidavits after the entry of summary judgment to contest the factual basis of the court's decision. We have consistently held that a party shall not assert, for the first time on appeal, issues that were not litigated below. The Kelmar Corp. v. District Court, 269 Minn. 137, 130 N. W. 2d 228 (1964). Prior to the entry of summary judgment, defendant did not know the facts which the court had accepted for purposes of the motion. By its motion for amended findings, defendant attempted to point out to the trial court that it believed that some of the factual conclusions were not supported by the record. The accompanying affidavits were presented to show that not only were those conclusions without support, but were untrue. This seems to be the most judicially expeditious method of challenge. 2 Hetland & Adamson, Minnesota Practice, Civil Rules Ann., p. 501.

Although an order denying a motion for amended findings is not appealable, Urbanski v. Merchants Motor Freight, Inc. 239 Minn. 63, 57 N. W. 2d 686 (1953), such an order may be reviewed on appeal from the judgment. Lehman v. Hansord Pontiac Co. Inc. 246 Minn. 1, 74 N. W. 2d 305 (1955). Findings of fact in a summary judgment proceeding are not entitled to the respect which an appellate court is required to give findings made pursuant to Rule 52.01, Rules of Civil Procedure. Whisler v. Findeisen, 280 Minn. 454, 160 N. W. 2d 153 (1968). Thus, defendant on appeal need not overcome the "clearly erroneous" standard to be successful on this issue. However, we have carefully reviewed this matter in this context and affirm the decision of the trial court.

■ Defendant further argues that a determination that its coupon plan is usurious be prospective only. In support, defend-

ant cites In re Estate of Jeruzal, 269 Minn. 183, 130 N. W. 2d 473 (1964), and Spanel v. Mounds View School Dist. No. 621, 264 Minn. 279, 118 N. W. 2d 795 (1962). Both of those decisions involved the prospective overruling of existing law or statute. This is simply not the case here. Rather, we are refusing to extend the time-price doctrine to defendant's coupon book plan. We see no need to give prospective effect only to our decision, especially in light of the public purpose of usury statutes to protect those who cannot protect themselves.

■ Defendant also challenges the propriety of permitting use of the class action mechanism. Class actions are governed by Rule 23, Rules of Civil Procedure. Rule 23.01 provides as follows:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The court allowed the claims to proceed as a class action under Rule 23.02(3), which provides as follows:

"An action may be maintained as a class action if the prerequisites of Rule 23.01 are satisfied, and in addition:

\* \* \* \* \*

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the

litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

In Advisory Committee Note—1968, commenting on Rule 23, the following appears:

"Subdivision (3) of Rule 23.02 involves cases that have not traditionally fallen within the class action concept but might well be tried better as a class action to achieve economies of time and expense and to promote uniformity of decision without sacrificing procedural fairness to the individuals who might be involved. A prerequisite to defining a class action under this subdivision is that the common questions predominate over the individual questions."

Rule 23.03(4) provides as follows:

"When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

The trial court limited the class action to the single issue of usury and further limited it to the question of liability, exclusive of damages and counterclaims, basing its ruling on the provision of Rule 23.02(3) requiring that the questions of law or fact common to the members of the class predominate over any question affecting only individual members.

Under the rules quoted above, we have no difficulty in concluding that the trial court properly allowed a class action in these proceedings and, further, that the trial court correctly segregated the issue of usury as the single item for class-action determination. Although this ruling recognizes the need for multiple proceedings to determine the individual damages of the class members, the predominance of a common issue of liability over individual questions of damage has been frequently recognized. See, for example, State of Minnesota v. United States Steel

Corp. 44 F. R. D. 559 (D. Minn. 1968); Eisen v. Carlisle & Jacquelin, 391 F. 2d 555 (2 Cir. 1968); Philadelphia Elec. Co. v. Anaconda American Brass Co. 43 F. R. D. 452 (E. D. Pa. 1968).

Defendant challenges this determination on the basis that usury is a peculiarly personal defense not available to a stranger in a loan transaction. Drew v. Skeena Lbr. Co. 180 Minn. 358, 230 N. W. 819 (1930). Defendant further questions whether plaintiffs may properly assert the usury action as personal representatives of the remaining members of the class, since Minn. St. 334.02 limits the defense to the individual himself or his personal representative. We hold that the class action for determination of the question of usury is not violative of the statutory provision. The individual may choose not to participate in the class action by "opting out" in compliance with the notice. This is an adequate means of protecting the personal interest of any debtor of defendant and is in accordance with the provisions of Rule 23.03(2).

In addition, the class action is superior to other methods in promoting the public purpose of the usury statute to protect those who cannot protect themselves. Defendant exacted illegal interest from numerous people. We note that the trend in the Federal courts is to disallow the class action under the Federal Truth-in-Lending Act (15 USCA, § 1601, et seq.) as not being the "superior" method of adjudication. See, Ratner v. Chemical Bank New York Trust Co. 54 F. R. D. 412 (S. D. N. Y. 1972). Those decisions weigh heavily the $100 minimum recovery for violations under the act. Minn. St. 334.02 does not offer a similar incentive to individual litigations. Class actions have been allowed in two recent Federal actions for usury under the National Banks Act, 12 USCA, §§ 85, 86. Partain v. First Nat. Bank of Montgomery, 59 F. R. D. 56 (M. D. Ala. 1973), and Cohen v. District of Columbia Nat. Bank, 59 F. R. D. 84 (D. D. C. 1972). In the former case the court recognized that the potential recovery was too small to justify individual litigation.

All members of the class are entitled to recover the interest

charged them. It is unreasonable to assume that they will all litigate individually their just claims. We hold that the order of the trial court allowing this matter to proceed as a class action on the single issue of usury was proper under the statute and Rules of Civil Procedure applicable thereto and affirm such order.

However, in reviewing the order establishing the class action and the notice sent to the coupon book purchasers of defendant, we reach the conclusion that a modification must be made therein limiting this action to collection of interest only. The Johnson complaint seeks only recovery of illegal interest. However, the Rathbun complaint also has a prayer for relief seeking to have the entire agreement declared void. We believe that the recovery of both interest and principal provides a remedy too harsh under the circumstances.[8] This limitation will facilitate the disposition of all claims. It will be a simple procedure to review each contract to determine the amount of principal and the premium of any credit life or credit health and accident insurance. Any payments in excess of that amount should be refunded to the customer. The customer will be obligated for any deficiency in the amount of principal paid. This limitation will also eliminate the need to create subclasses for those agreements entered prior to and after January 1, 1971.

It is necessary to vacate the judgment entered in the Johnson case in order to submit an amended notice of class action to the proper parties as previously determined by the trial court.[9] We note that the present notice of class action states: "[P]laintiffs seek to recover finance charges heretofore paid under such Plan and to have the contracts issued under such Plan declared *void*." (Italics supplied.) The new notice should exclude that portion of the notice seeking to declare the contracts void and specifically limit recovery to interest charges.

---

[8] Minn. St. 334.02 and 334.03 specifically provide for these alternative remedies.

[9] Rule 23, Rules of Civil Procedure, requires that notice be given prior to the entry of judgment.

Therefore, we order that the summary judgment entered in Johnson be vacated and the matter remanded to the trial court for the issuance of an amended notice of class action consistent with this opinion. We reverse the orders consolidating the two actions and permitting Rathbun to be maintained as a class action. However, we permit the summary judgment in Rathbun to stand. The named plaintiffs and intervenors in that action may proceed individually or may join the class action in the Johnson litigation. After the amended notice of the class action in Johnson has been given, the trial court is instructed to again order entry of the summary judgment on the issue of usury and to proceed with a determination of the obligation of defendant to the class members. Nothing in such proceedings shall preclude the right of defendant to proceed against those customers who have an unliquidated balance due on their principal account following full allowance for finance charges. In the determination of attorneys' fees in the class action, the trial court is instructed to treat the attorneys for both Rathbun and Johnson as successful attorneys on the issues herein. The Rathbuns' attorneys are not to be precluded from allowance of attorneys' fees in the Johnson class action if their clients elect to proceed on an individual basis.

Affirmed in part; reversed in part (No. 44328).

Judgment vacated and matter remanded with directions (No. 44332).